**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GAI KUOT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 3:17-cv-01011** |
| **v.** | ) | |
| | ) | **Judge Trauger** |
| **CHERRY LINDAMOOD,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM**

Gai Kuot, an inmate of the South Central Correctional Facility in Clifton, Tennessee, filed

a pro se petition for writ of habeas corpus challenging his 2012 conviction and sentence for first

degree murder, felony murder, and especially aggravated robbery for which he is currently serving

a sentence of life imprisonment in the Tennessee Department of Correction. (Doc. No. 1).

The respondent has filed a response to the habeas petition. (Doc. No. 11). The petition is

ripe for review, and this court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully

considered the record, the court finds that an evidentiary hearing is not needed, and the petitioner

is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

**I.    Procedural History**

On June 18, 2012, a Davidson County jury convicted the petitioner of first degree murder,

felony murder, and especially aggravated robbery. (Doc. No. 8, Attach. 1 at PageID# 86-88). The

court merged the murder convictions and sentenced the petitioner to life imprisonment on those

two counts. (*Id*. at PageID# 86-87). The court also sentenced the petitioner to sixteen years'

imprisonment for especially aggravated robbery, to run concurrently with his life sentence. (*Id*. at

PageID# 88).

The petitioner appealed, and the Tennessee Court of Criminal Appeals affirmed the judgment of the lower court on August 26, 2013. *State v. Kuot*, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *1 (Tenn. Crim. App. Aug. 26, 2013), *perm. app. denied* (Dec. 11, 2013). The Tennessee Supreme Court denied the petitioner's application for discretionary review. *Id.*

The petitioner filed a timely petition for post-conviction relief in the Davidson County Circuit Court. (Doc. No. 8, Attach. 16 at PageID# 1261-74). The post-conviction court appointed counsel, who filed an amended petition. (*Id.* at PageID# 1275-76, 1281-86). Following an evidentiary hearing, the post-conviction court denied the petition. (*Id.* at PageID# 1291-94).

The petitioner filed a timely notice of appeal, and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Kuot v. State,* No. M2016-00485-CCA-R3-PC, 2016 WL 7395687, at *1 (Tenn. Crim. App. Dec. 21, 2016), *perm. app. denied* (Apr. 13, 2017). The Tennessee Supreme denied the petitioner's application for discretionary review. *Id.*

On July 3, 2017, the petitioner filed the instant pro se petition for writ of habeas corpus.[1] (Doc. No. 1 at 15). By order entered on July 26, 2017, the court directed the respondent to file an answer, plead or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 3). The respondent filed a response to the petition on September 22, 2017, conceding that the petition is timely and urging the court to dismiss the petition. (Doc. No. 11). The petitioner filed a reply to the respondent's response. (Doc. No. 12). The petitioner subsequently sought to amend his petition (Doc. No. 16) and, by order and memorandum opinion entered on September 7, 2018, the court denied leave to file an amended petition (Doc. Nos. 18 and 19).

---

[1] Under the "prison mailbox rule" of *Houston v. Lack*, 487 U.S. 266, 270 (1988), and the Sixth Circuit's subsequent extension of that rule in *Richard v. Ray*, 290 F.3d 810, 812 (6th Cir. 2002) and *Scott v. Evans*, 116 F. App'x 699, 701 (6th Cir. 2004), a prisoner's legal mail is considered "filed" when he deposits his mail in the prison mail system to be forwarded to the Clerk of Court. Here, the petitioner signed and dated his petition on July 3, 2017, although the Clerk's Office did not receive and file the petition until July 7, 2019. Under the prison mailbox rule, the court considers July 3, 2017, as the date of filing.

In his Section 2254 petition, the petitioner asserts the following claims:

1.      Claim 1:  Whether the Tennessee Court of Criminal Appeals erroneously concluded that Sammy Sabino's testimony was admissible as an exception to the hearsay rule;

2.      Claim 2: Whether the Tennessee Court of Criminal Appeals erroneously determined that Petitioner's right to a speedy trial was not violated;

3.      Claim 3:  Whether the State failed to provide Petitioner with exculpatory materials under *Brady v. Maryland;*

4.      Claim 4:  Whether the trial court erroneously permitted a witness to testify regarding cellular telephone evidence;

5.      Claim 4A:  Whether trial counsel provided ineffective assistance of counsel by failing to prevent Detective Dean Haney from testifying as an expert about the petitioner's cellular telephone records;

6.      Claim 5: Whether trial counsel provided ineffective assistance by failing to call  Teresa Bostic as a witness; and

7.      Claim 6:  Whether trial counsel provided ineffective assistance of counsel by failing to request an interpreter for the petitioner during trial.  (Doc. No. 1).

## III.    Summary of the Evidence

### A.     Trial Proceedings

The Tennessee Court of Criminal Appeals summarized the proof adduced at the petitioner's jury trial as follows:

On June 11, 2010, the defendant was charged with premeditated first degree murder, first degree felony murder, and especially aggravated robbery, arising out

of the shooting death of the victim, Malith Wiek, in the early morning hours of April 21, 2010.

At trial, David Norton, facility manager for Montgomery Bell Academy, "MBA," testified that the victim, a "Lost Boy" refugee from Sudan, obtained employment at MBA as a custodial worker though [sic] Catholic Charities and World Relief Refugee Resettlement Programs on June 1, 2004. The victim maintained his employment until his death in April 2010. Norton was the victim's direct supervisor and noted that the victim "got along with everybody."

Norton testified that the victim's shift began at 1:00 p.m. and ended at 10:00 p.m., and he received an annual salary of $23,000. The victim also had a side business of selling long distance phone cards to other members of the refugee community in Nashville. As a result, the victim carried a large roll of cash in his pocket. Norton was never aware of an occasion when the victim was in need of financial assistance. The morning of April 21, 2010, Norton was notified by authorities that the victim was dead. He met with investigators and provided them with the victim's work schedule from the previous night.

Sergeant Mitch Kornberg with the Metro Nashville Police Department testified that he responded to an injured person call at 42nd Avenue North and Indiana Avenue on April 21, 2010. When he arrived, Sergeant Kornberg saw a black male sitting on the ground, leaning against a chain-link fence. The individual had been shot multiple times and was deceased. The body was located in the corner of an L-shaped part of the fence outside a business, and Sergeant Kornberg surmised that the victim had been trapped in this portion of the fence. The victim was wearing a maroon MBA shirt with tan pants and a name tag on a lanyard around his neck. Sergeant Kornberg noticed calling cards or credit cards on the victim's lap.

William Deng testified that he immigrated to the United States in 1995, and he was reacquainted with the victim, his cousin, when the victim moved to the United States in 2004 from Sudan. Deng knew the victim's father, as they were from the same village in Sudan. In 2009, Deng relinquished his apartment and visited Sudan for three months. When he returned to the United States, Deng moved in with the victim and the defendant in their apartment at 5800 Maudina Avenue. The victim and the defendant each occupied a bedroom, and Deng slept on the couch. Deng gained employment at Standard Candy Company about two months after moving in with the victim and the defendant. After he got a job, Deng started paying rent to live in the apartment.

Deng testified that, before his return trip to Sudan, he worked in a security job, which required that he carry a gun. He bought a PT 92 Beretta nine-millimeter at Gun City USA, and he had two magazines for it—one he kept in the weapon and one in the glovebox of his Nissan Pathfinder. Deng stored the gun between the driver's and passenger's seats, hidden from view. On April 12 or 13, 2010, Deng discovered that his gun was missing and called the police. His car was locked and

showed no signs of forced entry. Whoever took Deng's gun did not take its holster or the magazine in the glovebox. The police informed Deng that he had to have the serial number in order to file a report, so he went to Gun City and paid them to retrieve his serial number. After a phone call and visit by Deng, Gun City had still not provided the serial number, although an employee informed Deng that "[t]hey ha[d] a lot of leads[.]" Deng noted that he always placed his keys on the kitchen table when he entered the apartment, as did both the victim and the defendant. He said that he and the victim got along well.

Deng testified that the victim bought calling cards in bulk and sold them to members of the Sudanese community in Nashville, often at a coffee shop on Murfreesboro Road popular amongst the Sudanese men. When the victim received cash for the cards, he either took it to the bank or put it in his pocket. Deng noted that the victim "sometimes" had cash on him. The victim carried the phone cards in a black computer bag that he kept with him or in his room.

Deng testified that, during this time period, he was studying Criminal Justice at Strayer University and attended classes on Monday and Tuesday evenings from 6:00 to 10:00 p.m. On April 20, 2010, Deng got out of class early, around 9:00 or 9:20 p.m., and went home and watched a basketball game. No one else was home at the time, and Deng fell asleep on the couch and did not hear either of his roommates come home that night.

Deng testified that, the next morning, two or three detectives came to the apartment and spoke with him. The detectives knocked on the door to the defendant's bedroom and, although Deng had not heard the defendant come home, the defendant exited his room wearing street clothes. Deng thought it was unusual that the defendant was not wearing "sleeping clothes" like he normally did. After seeing that the defendant was home, Deng expected the victim to be home as well and was surprised that the victim was not in his room.

Deng testified that the officers asked them to come to the police station, and Deng drove himself and the defendant there to be interviewed. Deng recalled that the victim drove a Nissan Sentra, and he showed the police where the victim had bought the car. Afterwards, Deng and the defendant went back to their apartment. Deng asked the defendant if he had spoken with the victim the previous night, and the defendant said, "No." Deng recalled that a funeral service was held for the victim, and the defendant did not attend.

Deng testified that the defendant did not have a job at the time of the murder and had not had one for approximately two years. He said that the defendant had ridden in his car before and knew that he kept a gun in his car. Deng recalled that the victim had loaned money to people, but he was not aware of the victim loaning the defendant any money.

On cross-examination, Deng denied that the victim told him that he would have to leave the apartment because his name was not on the lease. Deng also denied that he tried to borrow money from the victim when he returned from Sudan and the victim refused to lend it to him. Deng said that he did not meet the defendant in 2007 and that he had only known the defendant for about a year.

Sammy Sabino testified that he was a co-worker of the victim's at MBA. On April 20, 2010, Sabino worked from 5:13 p.m. to 2:07 a.m., and he saw the victim during a work break. Noting that he should have gotten off work already, Sabino asked the victim what he was still doing at work. The victim indicated that he was going to a Kroger store to meet someone, and he was waiting at work until that person's shift started. The victim also told him that he was going to be picking up a roommate in Gallatin later that evening but did not identify which roommate. Around 11:15 p.m., the victim said he was going to Kroger and left in his black Nissan Sentra. Sabino did not see the victim with a jacket that evening. Sabino was aware that the victim sold telephone calling cards and had seen the victim with large sums of money on his person. Sabino had warned the victim that it was not safe to carry around large amounts of cash.

Michael Owens, an employee of the Belle Meade Kroger store, supplied officers with the April 20, 2010 footage from the store's surveillance cameras. The officers asked Owens if Abraham Malook had been working that night and the hours he worked. Owens informed the officers that Malook had stocked items in the dairy department and had worked his entire shift of 11:00 p.m. to 7:00 a.m. The surveillance footage showed a tall, Black man wearing a red shirt and khaki pants leaving a black car and entering the store at 11:31 p.m. The footage showed the same man leaving the store alone at 11:35 p.m.

Stacey Newman testified that she lived at 620 41st Avenue North, which was in close proximity to 42nd Avenue North, in April 2010, and she heard two or three gunshots around 12:30 a.m. on April 21, 2010.

Officer William Kirby with the Metro Nashville Police Department's Identification Unit testified that he responded to the scene at 42nd Avenue North and Indiana Avenue at 8:45 a.m. on April 21, 2010. He took photographs, diagramed the crime scene, and collected evidence. He retrieved four spent nine-millimeter shell casings and one unfired nine-millimeter round from the scene. Two of the spent rounds were located near the victim's feet, as was the unfired projectile, and two spent rounds were located a distance to the east on Indiana Avenue. The location of the two spent rounds on Indiana Avenue led Officer Kirby to believe that the shooter fired as he was moving to the west in pursuit of the victim. In addition, Officer Kirby found various items scattered around the victim's body, one of which was a prepaid phone card. Officer Kirby noted that there was also an empty cell phone case attached to the victim's belt. The officer recovered an additional projectile from the warehouse that stood approximately 150 to 200 feet behind the victim's body.

Detective Tim Codling with the Metro Nashville Police Department testified that he responded to the scene where the victim's body was found on April 21, 2010. Detective Codling canvassed the area and also interviewed the bus driver who first saw the victim's body. No one he spoke to heard shots fired or saw anyone fleeing the scene.

Officer Charles Linville with the Metro Nashville Police Department Technical Investigation Section responded to the crime scene at 42nd Street and Indiana Avenue on April 21, 2010, and took photographs of the area. The following day, Officer Linville went to the victim's apartment to collect a sample of the defendant's fingerprints. He also photographed items detectives pointed out while searching two vehicles, William Deng's dark-colored Toyota Pathfinder and the defendant's white Volvo, outside of the apartment and collected some of those items as evidence. Evidence retrieved from the Pathfinder included a magazine of Independence brand nine-millimeter ammunition. Evidence collected from the Volvo included four phone cards and two Western Union receipts. The Western Union receipt indicated that Gai Deng wired $ 100 to Uganda at 2:30 p.m. on April 20, 2010. The Western Union used by "Gai Deng" was located at the Charlotte Pike Kroger.[2]

Officer Nathaniel Ward with the Metro Nashville Police Department Crime Scene Unit was dispatched to a scene at 1118 Sharpe Avenue on April 21, 2010, to process a black Nissan Sentra parked in the alley that was believed to have been involved in a homicide. There were two bullet holes in the driver's side of the car that appeared to have been fired from the interior of the vehicle, and a cartridge casing was located on the front passenger's side. The driver's side rear window had been shattered by a gunshot, but it could not be determined whether the shot was fired from inside or outside of the car. The victim's wallet was found in the grass near the vehicle. The wallet's contents were found on the ground beside it.

Felicia Evans with the Metro Nashville Police Department Crime Scene Unit testified that she was involved with Officer Ward in processing the black Nissan Sentra recovered from Sharpe Avenue. She noted that the magazine of unfired bullets recovered from the car were Independence nine-millimeter Lugers, a brand that was not "very common to our area." She elaborated that "it is a very rare occasion that you find an entire magazine full of Independence." She recalled that the cartridge casing recovered from the passenger's side of the car between the seat and the door was also Independence brand. Evans stated that the evidence indicated that two shots had been fired from inside the vehicle and exited the vehicle on the driver's side.

Linda Wilson, an expert in latent print examination with the Metro Nashville Police Department, testified that a fingerprint lifted from the back of a camera found in the victim's car belonged to the defendant. On cross-examination, Wilson

---

[2] The defendant provided the name "Gai Deng" when he was questioned by the police on April 21, 2010. *State v. Kuot*, 2013 WL 4539020, at *6.

acknowledged that she had no way of knowing when the fingerprint was placed on the camera.

Dr. Amy McMaster, an expert in forensic pathology, conducted an autopsy of the victim and determined that the victim received a total of eight gunshot wounds. Among these wounds were one to the larynx, a grouping of three to the torso, another to the left lower chest area, one to the left forearm, one to the upper left thigh, and one to the right knee. She said that the gunshot wound to the victim's knee would have made running very difficult and painful. Dr. McMaster did not observe any gunshot residue or soot on the victim's wounds or clothing.

Paul Remijo, a native Kenyan, testified that he met the defendant through his former roommate and had known him for about five months. In April 2010, Remijo lived at 2548 Willow Branch in Antioch. Remijo said that the defendant and Dennis Ogwang were at his house playing cards on April 18, 2010 until about midnight. They did not play cards on April 20, 2010.

Dennis Ogwang testified he last played cards with the defendant on Sunday night, April 18, 2010, at Remijo's house. On Tuesday night, Ogwang was actually playing poker at Bailey's Sports Bar, and the defendant was not there. Ogwang recalled that, before he went to the police station to talk to the police, the defendant called him and asked if the police had called him. Ogwang asked the defendant, "Why," and the defendant responded that he was being investigated for something. The defendant then said to Ogwang, "Hey, if the police ask you, can you tell them that we played cards on Tuesday?" The defendant said that the police would be asking Ogwang if he played cards with him on Tuesday, and the defendant wanted Ogwang to tell them that he had. Ogwang told the police about his conversation with the defendant, and he called the defendant on speaker phone while with the police.

Yvonne Claybrooks testified that, on April 21, 2010, she and her neighbor were sitting on her front porch on DeMoss Road when they saw a white, four-door Volvo with a yellow marking on one of its tires stop in front of the vacant lot next to her house. She saw a black arm reach out the window and throw a red jacket over the car and into the ditch. However, the car's windows were so tinted Claybrooks could not see the driver's face. After the car left, Claybrooks and her neighbor walked down to the ditch to see what had been thrown out. Using a stick, they found a stack of phone cards held together with a rubber band in the middle of the jacket.

Claybrooks testified that the police were in the area the next day searching the location where the jacket had been thrown. As they were searching, Claybrooks saw the Volvo drive down her street. Claybrooks walked over to the police and told them everything that she had seen. The next day, Claybrooks saw a man wearing flip-flops walk completely up and back down her street, talking on his cell phone and looking in the ditch. Claybrooks did not recognize the man, and she thought it was strange that he was wearing flip-flops because most people wore sneakers

when they walked on the street for exercise. She thought it was "so strange" to see this individual that she called Detective Truitt. The detective came to her house and showed her a photographic array, from which she identified the defendant as the man she saw walking down the street searching in the ditch.

Royce Cavender testified that he was walking his dog on DeMoss Road around 5:00 p.m. on April 21, 2010 when he noticed a red jacket lying in the ditch with a stack of cards beside it. The jacket looked "out of place," so he called the police.

Officer James Rowland with the Metro Nashville Police Department testified that he responded to "a found property call" on April 21, 2010 on DeMoss Road. After his investigation, he collected a maroon jacket and some calling cards from the ditch beside the road.

Agent Jennifer Shipman, a forensic scientist with the Tennessee Bureau of Investigation, "TBI," testified that one of the exhibits she tested in this case was the red jacket recovered from DeMoss Road. There was blood on the right cuff of the jacket, and the DNA profile was a match to the victim. She later swabbed inside the cuff and the collar of the jacket and was unable to exclude the victim or the defendant as the contributor of the partial profile of DNA she obtained.

Detective Dean Haney with the Metro Nashville Police Department reviewed the victim's cell phone records and tracked which cell phone towers the victim's phone used on the night of the murder. The victim's cell phone was used in the Chickamauga area of East Nashville. Detective Haney testified that when he went to the victim's apartment on April 21, 2010, as part of the investigation, William Deng was present, as was the defendant, who gave the name of Gai Deng. He said that the defendant appeared to be dressed in street clothes. The jury was shown the surveillance footage from the Kroger store during Detective Haney's testimony. Detective Haney said that the subject in the video was wearing similar clothing to what the victim was wearing that night, but the quality of the video prevented a positive facial identification.

Detective Russell Thompson with the Metro Nashville Police Department detailed his actions in investigating the case, including interviewing the defendant twice on April 21, 2010. On April 22, 2010, Detective Thompson was on DeMoss Road looking into some personal property that had been found there. He noted that DeMoss "was kind of a cut-through to M[audina] Avenue, which is where the defendant lived at that time." While there, Detective Thompson saw the defendant drive by in a white Volvo. He later assisted in a third interview of the defendant.

Detective Thompson testified that, in his first interview of the defendant, the defendant said that he had not talked to the victim in person or on the phone since 12:30 p.m. on April 20, 2010, when the victim was going to work. During the second interview of the defendant, the defendant maintained that he had not spoken to the victim on his cell phone. After Detective Thompson received the victim's cell

phone records, he learned that there had been several calls between the victim's and the defendant's phones from around 10:30 p.m. until shortly after midnight on the night of the murder, which was contrary to what the defendant had told them.

Detective Thompson testified that the defendant told them that he was playing cards with "Dennis" in Antioch the evening of April 20, 20 10. Detective Thompson noted that the defendant had given Detective Truitt permission to look through his cell phone, and Detective Truitt had written down the phone number for Dennis. When the detectives asked the defendant for Dennis' number, the defendant took his phone back, looked through it, handed it back, and said that the number was not in there. Detective Thompson said that they discovered that Dennis' number had been erased.

Detective Thompson testified that the defendant initially told him that he did not know of the victim's having a checking or savings account. However, during his investigation, he learned that checks made out to the defendant had been written from the victim's bank account. The defendant initially told them that the victim had written the checks. During his second interview, the defendant said that the victim had given him the checks.

Detective Thompson testified that they recovered a book from the victim's car. One of the pages had the name "Abraham Malook," next to two dates, "2/27/10 and 3/27/10." Written next to Malook's name was "$400." Detective Thompson stated that the dollar sign in that entry could be a dollar sign or the number eight.

On cross-examination, Detective Thompson acknowledged that the defendant gave them the phone number for the person he was allegedly playing cards with on the night of the murder. He admitted that he did not have a gunshot residue test performed on the defendant even though he interviewed him less than twelve hours after the murder occurred, but he explained that he chose not to do one because "[a]t that point, he [was] just a roommate." Detective Thompson recalled that Abraham Malook owed the victim some money. On redirect, after refreshing his recollection, Detective Thompson stated that Abraham Malook told the police that the victim had come to the Kroger store where he was employed on April 20 to "ask him about four hundred dollars that he borrowed."

Detective Stanley Truitt with the Metro Nashville Police Department testified regarding the actions he took as lead investigator in this case. He visited the crime scene, then went to the victim's apartment and had both of the victim's roommates go to the police station and interviewed them. After learning from the victim's phone records that the defendant was the last person the victim talked to, Detective Truitt interviewed the defendant a second time because the defendant had originally said that he had not talked to the victim.

Detective Truitt testified that, after the second interview of the defendant, he learned about the recovery of the red jacket and calling cards on DeMoss Road.

While on-site speaking with Yvonne Claybrooks, Detective Truitt saw a white Volvo drive by that Claybrooks identified as being the vehicle from which the items were thrown. Detective Truitt could see the driver of the car, whom he identified as the defendant.

Detective Truitt testified that a group of Sudanese lived at 1149 Sharpe Avenue, "in very close proximity" to where the police found the victim's car. Detective Truitt also recalled listening to Ogwang's conversation with the defendant over speaker phone, the "gist" of the conversation being the defendant telling Ogwang to "[j]ust tell them that I was with you playing cards."

Detective Truitt testified that he interviewed the defendant a third time. At some point during the interview, the defendant was asked to write his name and the victim's name, and the defendant changed portions of his name after he had written it but denied doing so. Detective Truitt said that the defendant never admitted that he was not in Antioch or that he wrote and forged the victim's checks.

Detective Truitt testified that he interviewed the defendant's girlfriend, Teresa Bostic, and, based on information she provided, he went to a pawnshop at 801 Gallatin Pike and obtained the store's video surveillance footage from March 29, 2010. The video showed the defendant looking at, among other things, the gun section of the pawnshop. The detective stated that papers were retrieved from the defendant's vehicle that indicated he owed the state for overpayment of unemployment benefits and also had an outstanding debt to a college in Michigan. They also found a request for emergency travel in the defendant's car. Detective Truitt drove the route between where the victim's body and his car were found, and it took him approximately fifteen minutes driving the speed limit.

On cross-examination, Detective Truitt admitted that Abraham Malook had left the area and could not be found. The detective agreed that the defendant said in his statement that the victim owed him $900 and that was the reason that the checks on the victim's bank account were written to him.

The parties stipulated that the defendant prepared six checks on the victim's account at SunTrust Bank as follows:

(1) Check number 194; April 8, 2010; $300

(2) Check number 195; April 10, 2010; $100

(3) Check number 196; April 13, 2010; $100

(4) Check number 197; April 17, 2010; $100

(5) Check number 198; April 18, 2010; $100

(6) Check number 199; April 19, 2010; $100

All of the checks were made out to the defendant and purported to bear the signature of the victim, but, in fact, the defendant signed the victim's name. The parties further stipulated that the defendant endorsed and cashed the checks.

Agent Michael Frizzell, an expert in the field of law enforcement use of communication records for the TBI, testified that he reviewed the phone records for the victim, the defendant, and William Deng for the time period in question and determined which cell phone antennas were utilized or "pinged" for various calls. He first noted that there were numerous communication events between the defendant's and the victim's cell phones the evening of April 20, 2010, until shortly after midnight on April 21, 2010. The defendant's cell phone "pinged" off of a cell antenna located at 738 Gallatin Pike for every call during this time period.

On April 20, the victim's cell phone first used an antenna close to MBA, where he worked. Around 11:44 p.m., the victim's phone started "pinging" off of different antennas, indicating that he was moving at that time. The final communication from the victim's cell phone occurred with the defendant at 12:13 a.m. on April 21. At that time, the defendant's cell phone "pinged" off the T–Mobile antenna located on Gallatin Pike and the victim's cell phone "pinged" off the Sprint antenna on McFerrin Avenue, which were the closest antennas to 1118 Sharpe Avenue where the victim's car was found.

Agent Frizzell testified that the distance between 184 Twin Oaks Drive in Antioch, an address provided to him by Detective Truitt, and the T–Mobile antenna on Gallatin Pike was 5.9 miles and there were fifty-seven other cell antennas between the two locations. If the defendant's phone was near the Antioch address, it should have used any of those fifty-seven other antennas before it used the antenna on Gallatin Pike. From his investigation, Agent Frizzell found no times during the particular time frame at issue when the defendant's cell phone "pinged" off of an antenna in Antioch. Agent Frizzell stated [that] the William Deng's cell phone "pinged" only off a cell antenna located near his apartment during the time in question.

The defendant, a native of South Sudan, testified that he considered the victim his best friend and like a brother. He acknowledged that he was not working during the time he lived with the victim but said that he was drawing unemployment and obtained a job at Walmart about a month before the murder. He said that he knew the victim sold calling cards.

The defendant testified that he loaned the victim $900 from his 2008 tax return so the victim could buy a car. He said that the victim could write in English but not very well, so he had other people, including the defendant, fill in his checks for him. The victim had the defendant fill out checks to himself and sign them for him, which were in repayment of the loan. The defendant acknowledged that the victim

could write his own name but allowed the defendant to write the checks because he trusted him.

The defendant testified that he possibly had a lapse of memory when he told the police that he did not speak to the victim on the phone on April 20, 2010. He said that the victim had asked him to call if he heard any news about an election going on in Sudan and that was what they discussed. The defendant claimed that he was playing cards in Antioch the first time he spoke to the victim and that he got home around midnight on April 21. He did not see the victim after the victim left for work around noon, and he did not shoot the victim. He did not know why Dennis Ogwang and Paul Remijo would deny playing cards with him that night but thought it might be because they were afraid of the police. He knew William Deng had a pistol, but he did not steal it.

The defendant recalled a time that the victim and William Deng got into an argument after the victim refused to loan Deng $200. The defendant said that Deng was not on their lease agreement, and he only paid rent one of the six months that he lived with them. The victim told Deng that he had to move. The defendant denied being in need of money during the time the victim was killed and said that he was sending money to his family in Africa. The defendant also denied throwing a red jacket and calling cards into a ditch on DeMoss Road.

On cross-examination, the defendant denied that the victim asked him to move out of the apartment. The defendant admitted that he spoke to the victim twice on the phone while the victim was at MBA on April 20. However, he alleged that Sammy Sabino lied regarding the content of their conversation because Sabino could not speak Dinka, a tribal Sudanese language. The defendant said that Yvonne Claybrooks and Dennis Ogwang also lied in their testimony. The defendant conceded that he knew a group of Sudanese men who lived on Sharpe Avenue and that he visited Sharpe Avenue regularly when his uncle lived there.

The defendant testified that he was the only person who used his cell phone on the night of April 20. The defendant agreed that Teresa Bostic, his girlfriend at the time of the incident, testified that he was looking for a gun at the pawnshop, but he maintained that he looked at many items in the pawnshop. The defendant admitted that he was in debt to the State of Tennessee for overpayment of unemployment benefits and that he also owed money to a college he attended in Michigan and the IRS. He stated that he only requested emergency travel to Africa because his brother-in-law died, but he conceded that he did not tell Detective Truitt that he intended to leave the country. The defendant denied initially telling the police that he did not know the victim had a bank account.

Following the conclusion of the proof, the jury convicted the defendant, as indicted, of premeditated first degree murder, first degree felony murder, and especially aggravated robbery.

*State v. Kuot*, 2013 WL 4539020, at **1-10.

**B.      Post-Conviction Proceedings**

The Tennessee Court of Criminal Appeals summarized the proof adduced at the

petitioner's post-conviction evidentiary hearing as follows:

> Counsel testified that he represented the Petitioner during his trial. He said that he
> and the Petitioner never discussed the need for an interpreter. Counsel
> acknowledged that he knew that the Petitioner was from Sudan. Counsel believed
> that, at the time he represented the Petitioner, the Petitioner had been in the United
> States for three or four years. Counsel said that, while in the United States, the
> Petitioner had been employed in Nashville and had attended one or two years of
> college. Counsel said that the Petitioner never mentioned using an interpreter at
> college.
>
> Counsel said that he never had a problem talking with the Petitioner "at all."
> Counsel gave the discovery to the Petitioner, and the Petitioner apparently could
> read it. The Petitioner did not ask Counsel to read it to him and did not ask for an
> interpreter. Counsel said the Petitioner appeared to understand him "perfectly
> well."
>
> Counsel said he reviewed the evidence with the Petitioner, and the Petitioner never
> indicated that he had any problem understanding their discussion. Counsel said that,
> throughout the trial, the Petitioner never expressed difficulty in understanding the
> proceedings or testimony. Counsel said that the Petitioner did not make "a very
> good witness" testifying on his own behalf because he lied, which came through
> during his testimony.
>
> Counsel agreed that he sometimes had to ask the Petitioner to repeat himself while
> he was testifying. He agreed that this may have been caused by his difficulty in
> understanding the Petitioner's response. He also agreed that some of the Petitioner's
> responses were not entirely grammatically correct, but he said that the Petitioner
> effectively conveyed his testimony.
>
> Counsel said that the Petitioner offered him an alibi for the evening of the murder,
> which was the same alibi he offered to police. The men that the Petitioner said he
> was playing cards with, however, denied being with the Petitioner the night of the
> murder. Counsel said he never filed a notice of alibi with the State because he could
> never verify the alibi.
>
> Counsel said he understood that the Petitioner would be cross-examined if he
> testified, but he never considered the need for an interpreter. Counsel said he never
> investigated whether there were interpreter services available to the Petitioner

because he never believed that they were necessary. He said his duty was to ensure that the Petitioner understood the trial and his rights, which was what he did.

During cross-examination, Counsel testified that during the course of his two-year representation of the Petitioner, he spoke with him extensively. He said that he tried to talk the Petitioner out of going to trial because he believed that the State had a "very good circumstantial case" against the Petitioner. Counsel said that he thought that the Petitioner had an "overwhelming chance of being convicted." Counsel testified that, during these conversations, he never doubted that the Petitioner understood him, and the Petitioner never expressed a lack of understanding.

Counsel testified that he reviewed the police video recorded interviews with the Petitioner. In the interviews, the Petitioner never said that he needed an interpreter. Further, he offered the police an alibi. Counsel said he also had two doctors, Dr. Pamela Auble and Dr. Kimberly Brown, interview the Petitioner, and neither indicated any difficulty understanding the Petitioner.

Counsel said that, during the Petitioner's trial, the Petitioner never asked anyone to stop or slow down based upon his lack of understanding English. Counsel identified the Petitioner's petition for post-conviction relief, and he noted that the Petitioner had filled out the document himself, indicating his level of understanding of the English language. Counsel said that the Petitioner could read and write English, noting that the Petitioner had written some things to him about his trial. Counsel said he "never had any problem communicating with [the Petitioner] and he never in[dicated] to [Counsel] that he was having problems with communication."

During redirect examination, Counsel said that the Petitioner was "nearly always pretty hostile" towards Counsel. Counsel felt the Petitioner had a "bad attitude" in that he was confrontational and demanding.

The Petitioner testified through an interpreter. He said that Counsel never told him that he had the right to an interpreter to understand the proceedings. He said that he had been in the United States for ten years, five years of which he was incarcerated. The Petitioner said that it was untrue that he had attended college. The Petitioner could not explain why he owed a university money.

The Petitioner said that his native language was Dinka and that he was from Sudan. He went to school in Sudan, where the teacher was English. The English was translated to Dinka for the students. The Petitioner said that, even in the United States, he spoke Dinka to his friends. He said that he spoke with his attorney and to other doctors in this case and that he told them that he did not understand some of what they were saying. However, none of the people he spoke with told him that he was entitled to an interpreter. He said that he did not learn that he could get an interpreter until he was incarcerated. The Petitioner said that he had never before been in legal trouble, so this was a new experience for him.

The Petitioner discussed his decision to testify. He said that Counsel never told him that he had a right not to testify or that the jury could not hold against him a decision not to testify. The Petitioner acknowledged that he drafted his petition for post-conviction relief. He said that it took him three or four months to draft and that "people" in prison helped him draft it.

During cross-examination, the Petitioner testified that he worked at Wal–mart after he came to the United States. The Petitioner denied ever going to college in Michigan. The State then read to him his trial testimony where he said "Back in 2007 when I was in Michigan, when I was in college in Michigan, he sent me a hundred dollars ...." The Petitioner maintained that he never went to college in Michigan. The State later asked the Petitioner if he went to Lansing Community College in Michigan. The Petitioner said he did not. The State noted that it had introduced evidence at trial showing that he went to that school, and the Petitioner maintained that he did not.

The Petitioner agreed that he filled out his own petition for post-conviction relief. He said he received assistance with writing the document. The Petitioner agreed that law enforcement found multiple letters in his car, one of which showed that he had applied successfully for unemployment. The Petitioner agreed that he had three long interviews with the police and that, during the interviews, he did not need assistance answering their questions. The Petitioner agreed that Counsel gave him all of the discovery and that the two discussed it at length. He said, however, that he did not understand everything that Counsel said to him.

The State pointed out to the Petitioner that the record showed that, before he testified, he was informed that he had a right not to testify. The Petitioner said that he did not "know what is right and what is wrong." He then agreed that he wanted to testify and to "represent his ideas" but explained that no one told him that he did not have to do so.

The Petitioner agreed that, during his trial, his friends including Sammy Sabino testified in English. The Petitioner agreed that he bragged to police that his English was better than the victim's, but he said that he was talking "about writing and not speaking. I can write my name, and that is what I said. And some people they don't know how to write their name."

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. It found that the Petitioner's testimony was not credible. The post-conviction court noted that the Petitioner did not indicate at any time during the trial or case preparation that he did not understand English. The court further noted that Counsel testified that the Petitioner was able to communicate with him and participate in his defense.

*Kuot*, 2016 WL 73595687, at **4-6.

### III.    Standard of Review

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woo*ds, 692 Fed. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)). As the Supreme

Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law

ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley*, 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429

(2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

**IV.     Analysis**

With these principles in mind, the court will turn to the examination of the claims raised in

Kuot's petition for habeas relief.

**A.     Claim 1:  Whether the Tennessee Court of Criminal Appeals erroneously concluded that Sammy Sabino's testimony was admissible as an exception to the hearsay rule**

First, the petitioner alleges that the Tennessee Court of Criminal Appeals erroneously

concluded that Sammy Sabino's testimony fell within an exception to the rule against hearsay.

(Doc. No. 1 at 4).  The respondent contends that this claim is not cognizable in federal habeas

proceedings and, in any event, the claim is procedurally defaulted.  (Doc. No. 11 at 22).

In order to qualify as exhausted, a claim must have been presented to the state's highest

court, *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990), and must have been presented in a

form which allows the state court a full and fair opportunity to rule on the claim. *Justices of Boston*

*Mun. Court v. Lydon*, 466 U.S. 294, 302-303 (1984); *Manning v. Alexander*, 912 F.2d 878, 881

(6th Cir. 1990). A prisoner exhausts a claim by "fairly present[ing]" it to the appropriate trial and

appellate courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  "A petitioner can take four actions in

his brief which are significant to the determination as to whether a claim has been fairly presented:

(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases

employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or

in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging

facts well within the mainstream of constitutional law."  *Newton v. Million*, 349 F.3d 873, 877 (6th

Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by English v. Berghui*s,

529 F. App'x 734 (6th Cir. 2013). "General allegations of the denial of rights to a 'fair trial' and

'due process' do not 'fairly present' claims that specific constitutional rights were violated." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citation omitted).

Because relief under Section 2254 can only be based upon a violation of the United States Constitution or law or treaties of the United States, the claim must have been presented as an issue of federal constitutional law, not state law. *See Anderson v. Harless*, 459 U.S. 4, 6-7 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (internal citations omitted); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984) (holding that a petitioner must have presented his claim in the state court "as a federal constitutional issue-not merely as an issue arising under state law.").

Here, the petitioner failed to exhaust Claim 1 in the state court proceedings because he failed to present this claim as one of federal constitutional law. *State v. Kuot*, 2013 WL 4539020, at **13-14. On direct appeal to the Tennessee Court of Criminal Appeals, Petitioner argued that "[i]t was error for the trial court to admit, over defendant's objection, the hearsay statement of Sam Sabino." (Doc. No. 8, Attach. 12 at Page ID# 1135). In support of his argument, Petitioner cited only state law cases and the Tennessee Rules of Evidence. (*Id*. at Page ID# 1135-36). The petitioner failed to cite any federal case law employing a constitutional analysis with respect to the pertinent federal right alleged and failed to present his federal constitutional claim in a manner that fairly alerted the state court to the federal nature of his claim. The Tennessee Court of Criminal Appeals analyzed the petitioner's hearsay argument by applying state evidentiary and case law. *State v. Kuot*, 2011 WL 2306078, at **13-14.

By failing to present the federal constitutional claim alleged in the instant petition to the state courts, the petitioner procedurally defaulted the claim. He, therefore, has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual

prejudice as a result of the alleged errors. The petitioner does not argue that he can satisfy the cause and prejudice requirement (Doc. No. 1 at 5), and nothing in the record indicates that the petitioner can make a showing of a fundamental miscarriage of justice. Consequently, this claim must be dismissed as procedurally defaulted.

Furthermore, a claim that the state courts misapplied Tennessee law is not cognizable in a federal habeas petition. *See* 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"). "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). To the extent the petitioner asks the court to examine the state court's resolution of a state law evidentiary issue, the petitioner also fails to state a cognizable claim for federal habeas relief.

**B.** **Claim 2: Whether the Tennessee Court of Criminal Appeals erroneously determined that Petitioner's right to a speedy trial was not violated**

Next, the petitioner alleges that the Tennessee Court of Criminal Appeals erroneously concluded that the State did not violate the petitioner's right to a speedy trial. (Doc. No. 1 at 5). The respondent concedes that the petitioner exhausted this claim and argues that the state courts' rejection of the claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. (Doc. No. 11 at 23-28).

The record shows that the petitioner was indicted on June 11, 2010, and his case proceeded to trial exactly two years later on June 11, 2012. *State v. Kuot*, 2013 WL 4539020 at *10. The case was originally set for the trial on October 24, 2011, but was continued because the court

elected to hear an older case instead. *Id.* The petitioner filed a motion to dismiss for lack of a speedy trial on December 8, 2011. *Id.* The trial court heard the motion on January 13, 2012, and denied the petitioner's motion to dismiss, stating:

> I understand [the defendant] wants to go to trial. I want him to have his day in court, and he will have his day in court very soon. I don't think that he has been prejudiced in any way because of the circumstances that we operate under.

> As such, I am going to respectfully deny his motion to dismiss. And we will have his trial on the next trial date.

*Id.* at *10.

The petitioner raised this claim on direct appeal, arguing that the trial court erred in denying his motion to dismiss for lack of a speedy trial. *Id.* Specifically, he asserted that the two-year span of time between the date of the offenses and the trial date rendered the memories of the State's witnesses unreliable. *See id.* In evaluating this claim, the Tennessee Court of Criminal Appeals began by setting forth the governing legal standard for speedy trial claims under federal and Tennessee state law:

> Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn.1997). A right to a speedy trial is also statutory in Tennessee. *See* Tenn. Code Ann. § 40–14–101. The Tennessee Rules of Criminal Procedure provide for the dismissal of an indictment if there exists unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). The Tennessee Supreme Court employs the balancing test that the United States Supreme Court established in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether a speedy trial violation has occurred. *See State v. Simmons*, 54 S.W.3d 755, 759 (Tenn.2001). The *Barker* test weighs (1) the length of delay, (2) the reasons for the delay, (3) the accused's assertion of the right to a speedy trial, and (4) the prejudice resulting from the delay. *Barker*, 407 U.S. at 530–32. If a court determines, after applying the *Barker* balancing test, that a defendant has been denied a speedy trial, the remedy is dismissal of the indictment. *Id.* at 522. This court reviews the trial court's determination regarding whether the defendant's right to a speedy trial was violated for an abuse of *discretion. State v. Hudgins,* 188 S.W.3d 663, 667 (Tenn. Crim. App.2005) (citing State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App.1996)).

*State v. Kuot*, at *10. In considering the length of the delay, the Tennessee Court of Criminal Appeals found that the two-year delay triggered further inquiry but noted that a two-year delay is not necessarily unreasonable when compared to other cases. *Id.* at *11 (citing cases). In considering the reason for the delay, the court found that, although there was little evidence in the record regarding the reasons for the delay, part of the delay apparently was due to the defense seeking a mental evaluation of the defendant and part of the delay was due to the overcrowded court dockets. Therefore, this *Barker* factor, the court concluded, did not weigh for or against either party. *Id.* In considering the third *Barker* factor, whether the defendant asserted his right to a speedy trial, the court found that this factor weighed in the defendant's favor but noted that the delay prior to the defendant filing his motion for a speedy trial was "necessary, rational, and, in some regards, attributable to the defendant." *Id.* at *12. In considering the final and most important *Barker* factor, whether the accused has suffered prejudice from the delay, the court found that there was "no showing in the record that any witness suffered a loss of memory due to the passage of time, died, or became otherwise unavailable, or that the delay impeded the defendant's ability to defend himself." *Id.* Thus, the court determined that the record fully supported the trial court's finding that the defendant was not prejudiced in any way by the delay in trying the case. *Id.* Consequently, the Tennessee Court of Criminal Appeals concluded that the trial court did not abuse its discretion in denying the defendant's motion to dismiss due to speedy trial issues. *Id.*

The state appellate court correctly cited and applied the *Barker* test to analyze the petitioner's claim. *See Nichols v. Bell*, 1:10-cv-147, 2013 WL 5436966, at * 18 (E.D. Tenn. Sept. 27, 2013) ("Because the state court relied on *Barker* as supplying the governing legal principle to a speedy-trial claim, its decision is not contrary to the well[-]established rule in a Supreme Court case."). While the first and third factors favored the defendant, the second factor did not favor

either party because there were several reasons for the delay, including the delay in order for the defendant to receive a competency evaluation, which ensured a fair and effective prosecution of the case. The fourth and most important factor weighed against the defendant because he did not prove that the two-year delay caused witnesses to suffer memory loss or to become unavailable. He was unable to make a showing that the delay prevented him from mounting a defense.

The court finds that the Tennessee Court of Criminal Appeals' decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, the court finds that the state court's decision to reject the petitioner's speedy trial claim was not an unreasonable application of the law. The petitioner, therefore, is not entitled to habeas relief on this claim.

### C.    Claim 3:  Whether the State failed to provided Petitioner with exculpatory materials under *Brady v. Maryland*

In his third claim, the petitioner alleges that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. No. 1 at 6-7). In particular, the petitioner asserts that the State withheld evidence of a recorded telephone call of Dennis Ogwang and a computer printout listing the license plate number of the vehicle from which witnesses said they saw someone reach out the window and throw a red jacket into a ditch. (*Id.*) The respondent contends that this claim is procedurally defaulted because the petitioner did not "present this claim to the higher state court." (Doc. No. 11 at 28).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "[T]here is never a real '*Brady* violation' unless the nondisclosure

was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). To establish a *Brady* violation, three conditions must be met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82.

Nondisclosed evidence must be material for prejudice to result. *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (citing *Kyles v. Whitley*, 514 U.S. 419 (1995)). The Supreme Court has previously explained that "favorable evidence is material . . . 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id*. at 434 (quoting *Bagley*, 473 U.S. at 678). "[T]he materiality of withheld evidence may be determined only by evaluating the evidence collectively." *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003). "Evidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes of *Brady* analysis.'" *Brooks v. Tenn.*, 626 F.3d 878, 893 (6th Cir. 2010) (quoting *Carter v. Mitchell*, 443 F.3d 517, 533 n.7 (6th Cir. 2006)).

The petitioner did not raise a *Brady* claim on direct appeal, in his petition for post-conviction relief, or on appeal of the denial of his petition for post-conviction relief. Thus, he has never presented the claim to any state court, and the time for raising the claim in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting

one-year limitations period for post-conviction relief).  The petitioner  is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising the claim at this time.

Because the petitioner has never fully and fairly presented a *Brady* claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review.  *See Coleman*, 501 U.S. at 752-53.  The petitioner acknowledges his default of this claim and states that the reason for the default is that his attorney "refused to raise all issues on Petitioner's pro se post-conviction petition . . . through no fault of his own."  (Doc. No. 1 at 7-8).  In other words, the petitioner concedes procedural default but nonetheless argues that his default of this claim should be excused due to his attorney's refusal to raise and/or exhaust this claim in post-conviction proceedings.

Because there is no constitutional right to an attorney in state post-conviction proceedings, "ineffective assistance of counsel in those proceedings generally cannot serve as a cause for procedural default." *Hill v. Mitchell*, 842 F.3d 910, 937 (6th Cir. 2016) (citing *Coleman*, 501 U.S. at 752). The Supreme Court has carved out a limited exception to this general rule, in which habeas petitioners may be able to use ineffective assistance of post-conviction counsel as "cause" for default. *See Martinez,* 566 U.S. 1.  *Martinez* permits a petitioner to establish cause to excuse a procedural default of an ineffective assistance of trial counsel claim by showing that he received ineffective assistance by post-conviction counsel. *See id* at 9. "[T]he petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency." *Thorne v. Hollway*, No. 3:14–CV–0695, 2014 WL 4411680, at *22 (M.D. Tenn. Sept. 8, 2014) (quoting *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014)).

However, *Martinez* does not afford the petitioner relief from his procedural default of Claim 3. "Because the exception has been limited to 'substantial claims of ineffective assistance of trial counsel,' federal courts have routinely concluded that *Martinez* may not be used to overcome default as to other categories of claims, such as claims of structural error, prosecutorial misconduct, or trial court error." *Williams v. Cook*, No. 3:15-cv-00415, 2018 WL 4621820, at *7 (E.D. Tenn. Sept. 26, 2018) (quoting *Prystash v. Davis*, 854 F.3d 830, 836-37 (5th Cir. 2017)) (citations omitted). The *Martinez* exception does not apply to defaulted *Brady* claims. *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015) ("Even if we were to . . . analyze Abdur'Rahman's underlying claims of *Brady* violations and prosecutorial misconduct, *Martinez* would not apply to those claims . . . ."); *Williams*, 2018 WL 4621820, at **7-8 (finding that *Martinez* exception did not apply to demonstrate "cause" for petitioner's default of a *Brady* claim); *Hunton v. Sinclair*, 732 F.3d 1124, 1126-27 (9th Cir. 2013) (declining to extend *Martinez* to a *Brady* claim defaulted by state post-conviction counsel).

True, the prosecution's suppression of *Brady* material can constitute cause for the failure to exhaust a *Brady* claim. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). Establishing cause and prejudice to excuse the default of a *Brady* claim "'parallel[s] two of the three components of the alleged *Brady* violation itself.'" *Banks*, 540 U.S. 668, 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). A petitioner demonstrates "'cause' when the reason for his failure to develop facts in the state-court proceedings was the State's suppression of relevant evidence." *Banks*, 540 U.S. at 691. A petitioner demonstrates prejudice "when the suppressed evidence is 'material' for *Brady* purposes." *Id*. Thus, in order to demonstrate cause and prejudice to excuse the default, the petitioner must establish that the State suppressed relevant evidence and that the evidence was material. *See id*.

First, the petitioner alleges that the State wrongfully withheld a recorded telephone call by Dennis Ogwang "concerning playing cards on April 20, 2010." (Doc. No. 1 at 6). However, the petitioner has not produced any proof that the State suppressed the evidence or that this evidence exists. While the petitioner asserts that the telephone call "was manufactured by the police" as "an entrapment device" (*id*. at 7), he does not explain how the police "induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so." *See* Tenn. Code Ann. § 39-11-505. The petitioner does not even identity the parties who participated in this purported telephone call. Moreover, he fails to explain what exculpatory evidence this alleged recorded telephone conversation contained. In any event, the evidence at trial showed:

> [t]he defendant's repeated contention that he was playing cards in Antioch on the night of the murder was refuted by his cell phone records and by the testimony of the two witnesses, Paul Remijo and Dennis Ogwang, he claimed to be with. The defendant essentially asked Ogwang on two occasions, one of which while Ogwang was on speaker phone with the police, to lie to the police concerning the defendant's whereabouts on the night of the murder.

*Kuot*, 2013 WL 4539020, at *15. Thus, even if the alleged Ogwang recorded telephone call existed, it is unlikely that it would have resulted in a different trial outcome for the petitioner, given the other evidence adduced at trial, particularly considering the petitioner's request that Ogwang lie about the petitioner's whereabouts. The petitioner, therefore, has failed to show cause and prejudice to excuse the default of this claim.

Next, the petitioner alleges that the State wrongfully withheld a computer printout containing the license plate number of a white, four-door Volvo out of which witnesses saw a black arm throw a red jacket into a ditch. However, the petitioner has provided no proof that this printout exists or that the State suppressed this evidence. Again, the petitioner fails to explain how this printout is favorable and material to his defense.

The evidence adduced at trial included testimony that the petitioner drove a white, four-door Volvo (Doc. No. 8, Attach. 4 at PageID# 313, 319); on the day of the murder, Yvonne Claybrooks saw a white, four-door Volvo stop in front of the vacant lot next to her home; (Doc. No. 8, Attach. 3, Page ID# 244, 242); she then saw someone throw a red jacket into a ditch (*Id.* at Page ID# 242); the next day, Claybrooks saw the same Volvo drive down her street (*Id.* at Page ID# 243); she also saw a man walking up and down her street looking in the ditch, and she identified this man as the petitioner (*Id.* at Page ID# 243, 249); Detective Truitt was on the scene when the Volvo drove by a second time, and he identified the driver as the petitioner (Doc. No. 8, Attach. 5, Page ID# 528). The proof at trial thus established that the petitioner was the person who drove the white, four-door Volvo and threw the jacket out of the window. Therefore, even if the computer printout existed, the petitioner cannot show that there is "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Finding no basis upon which to excuse the petitioner's default of his *Brady* claims, this claims for relief must be denied.

### D.  Claim 4:  Whether the trial court erroneously permitted a witness to testify regarding cellular telephone evidence

In Claim 4, the petitioner alleges that trial counsel erroneously permitted Detective Dean Haney to testify about the petitioner's cellular telephone records.  (Doc. No. 1 at 8-9).  The respondent argues that this claim is procedurally defaulted and the petitioner cannot show cause and prejudice to excuse the default.  (Doc. No. 11 at 34-35). [3]

_____

[3] The petitioner also alleges that his attorney provided ineffective assistance of counsel by failing to "timely raise the cell phone record's [sic] claim."  (Doc. No. 1 at 10).  The court will address the ineffective assistance claim later, with the petitioner's other claims of ineffective assistance.

The petitioner did not raise this claim on direct appeal, in his petition for post-conviction relief, or on appeal of the denial of his petition for post-conviction relief. Thus, he has never presented the claim to any state court, and the time for raising the claim in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). The petitioner is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising the claim at this time.

Because the petitioner has never fully and fairly presented this claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. The petitioner acknowledges his default of this claim and states that his post-conviction attorney's failure to raise the issue constitutes cause to excuse the default. (Doc. No. 1 at 9).

Because there is no constitutional right to an attorney in state post-conviction proceedings, "ineffective assistance of counsel in those proceedings generally cannot serve as a cause for procedural default." *Hill v. Mitchell*, 842 F.3d 910, 937 (6th Cir. 2016) (citing *Coleman*, 501 U.S. at 752). The Supreme Court has carved out a limited exception to this general rule, in which habeas petitioners may be able to use ineffective assistance of post-conviction counsel as "cause" for default. *See Martinez,* 566 U.S. 1. *Martinez* permits a petitioner to establish cause to excuse a procedural default of an ineffective assistance of trial counsel claim by showing that he received ineffective assistance by post-conviction counsel. *See id* at 9. "[T]he petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner

was prejudiced by the deficiency." *Thorne v. Hollway*, No. 3:14–CV–0695, 2014 WL 4411680, at *22 (M.D. Tenn. Sept. 8, 2014) (quoting *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014)).

However, *Martinez* does not afford the petitioner relief from his procedural default of Claim 4. *Martinez* "may not be used to overcome default as to other categories of claims, such as claims of structural error, prosecutorial misconduct, or trial court error." *Williams v. Cook*, No. 3:15-cv-00415, 2018 WL 4621820, at *7 (E.D. Tenn. Sept. 26, 2018) (quoting *Prystash v. Davis*, 854 F.3d 830, 836-37 (5th Cir. 2017)) (citations omitted). Since the petitioner's claim is one of trial court error, *Martinez* therefore does not apply to excuse the default. The petitioner, therefore, is unable to establish cause and prejudice to excuse his procedural default of this claim. The petitioner is not entitled to relief, and Claim 4 will be dismissed.

### E. Ineffective Assistance of Counsel Claims

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 686-87; *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a

client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

> **1.      Claim 4A:  Whether trial counsel provided ineffective assistance of counsel by failing to prevent Detective Dean Haney from testifying as an expert about the petitioner's cellular telephone records**

The petitioner also asserts that "his attorney's failure to timely raise the cell phone record's [sic] claim was sufficiently egregious to constitute constitutionally ineffective assistance of counsel under *Strickland* . . . ."  (Doc. No. 1 at 10). The respondent argues that the petitioner procedurally defaulted this claim and cannot establish cause and prejudice to excuse the default. (Doc. No. 11 at 35-36).

The petitioner did not raise this claim on direct appeal, in his petition for post-conviction relief, or on appeal of the denial of his petition for post-conviction relief.  Thus, he has never presented the claim to any state court, and the time for raising the claim in the state courts has passed.  *See* Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief).  The petitioner  is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising the claim at this time.

Because the petitioner has never fully and fairly presented this claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally

defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. The petitioner acknowledges his default of this claim and relies on his post-conviction attorney's failure to raise the issue as cause to excuse the default under *Martinez*. (Doc. No. 1 at 9-10).

The Sixth Circuit has directed that a district court considering ineffective assistance of counsel claims under *Martinez* must first address whether the petitioner can demonstrate "(1) the absence or ineffective assistance of his post-conviction counsel and (2) the 'substantial' nature of his underlying [ineffective assistance of trial counsel claims]." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). If the petitioner demonstrates these first two elements, the petitioner has established cause to excuse the procedural default, and the district court must next determine whether the petitioner can establish prejudice from the alleged ineffective assistance of trial counsel. *Id*. If the petitioner successfully establishes cause and prejudice, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *Atkins v. Holloway*, 792 F.3d 654, 659–60 (6th Cir. 2015).

As part of showing a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under *Strickland*. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under *Trevino*, [petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under *Strickland*, a petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. 668, 694. The "actual prejudice" requirement of *Coleman* and the prejudice requirement of *Strickland* overlap such that

> in many habeas cases seeking to overcome procedural default under *Martinez*, it
> will be more efficient for the reviewing court to consider in the first instance

whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

*Thorne*, 2014 WL 4411680, at *23. The Supreme Court has defined this "substantial" showing as requiring a petitioner to show that the claim has some merit. *Martinez*, 566 U.S. at 12-13 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). The threshold inquiry at this stage "does not require full consideration of the factual or legal basis adduced in support of the claims"; rather, the court is required to engage in a preliminary, though not definite, consideration of the two-step framework mandated by *Strickland*. *Miller–El*, 537 U.S. at 336, 338.

The petitioner's underlying claim is that trial counsel was ineffective because he failed to prevent Detective Haney from testifying as an expert about the petitioner's cellular telephone records. However, the petitioner cannot show that his underlying claim of ineffective assistance of trial counsel is "substantial." *Woolbright*, 791 F.3d 628, 637. Primarily, Detective Haney did not testify about the petitioner's cellular telephone records; he testified about the *victim's* cellular telephone records. (Doc. No. 8, Attach. 4 at PageID# 296; Doc. No. 8, Attach. 5 at PageID# 429-31, 439). Even then, Detective Haney's testimony was limited due to an objection from trial counsel. (*Id.*) The only testimony about the petitioner's cellular telephone records came from Agent Michael Frizzell, and both parties stipulated that Frizzell was an expert in the field of law enforcement use of communication records for the Tennessee Bureau of Investigation. (Doc. No. 8, Attach. 6 at PageID# 623-57). Because Detective Haney did not provide any testimony about the petitioner's cellular telephone records, the petitioner cannot show that trial counsel's performance was constitutionally deficient in failing to prevent Detective Haney from testifying

about the petitioner's cellular telephone records. Therefore, the petitioner cannot show that his underlying ineffective assistance claim is substantial, and he is unable to establish cause and prejudice to excuse his procedural default of this claim. The petitioner is not entitled to relief on Claim 4A, and the claim will be dismissed.

2.    **Claim 5: Whether trial counsel provided ineffective assistance by failing to call Teresa Bostic as a witness**

The petitioner also alleges that trial counsel was ineffective when he failed to interview and present Teresa Bostic as a witnesses at trial or during his post-conviction proceeding. (Doc. No. 1 at 10-11). According to the petitioner, Ms. Bostic would have provided a valid alibi for the petitioner. (*Id*.) The respondent contends that the petitioner procedurally defaulted this claim and cannot show cause and prejudice to excuse the default. (Doc. No. 11 at 36). The respondent further contends that *Martinez* does not apply to excuse the default of the petitioner's ineffective assistance of trial counsel claim because *Martinez* only applies if a defaulted ineffective assistance of trial counsel claim is "substantial," meaning that it has "some merit." *Martinez*, 566 U.S. at 14. According to the respondent, the petitioner's ineffective assistance of trial counsel claim lacks substantiality.

The petitioner did not raise this claim in his petition for post-conviction relief and has never presented the claim to any state court. The time for raising the claim in the state courts has passed. *See* Tenn. Code Ann. § 40-30-106(g); Tenn. Code Ann. §§ 40-30-102(a), (c) (setting one-year limitations period for post-conviction relief). He is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from raising the claim at this time. The petitioner cannot now return to the state courts to properly exhaust this allegation of ineffective assistance due to the expiration of the state statute of limitations on post-conviction actions and the "one petition" limitation on post-conviction actions. *See* Tenn. Code Ann. § 40-30-102(a)

(statute of limitations); *id*. § 40-30-102(c) (one petition for state post-conviction relief). Therefore, the petitioner has procedurally defaulted this claim.

The petitioner acknowledges his default of this claim and states that his attorney's ineffectiveness provides cause to excuse the default. (Doc. No 1 at 11, 12). *Martinez*, however, does not provide relief because the defaulted claim is not substantial; it does not have merit. 566 U.S. at 14. Although the petitioner contends that he has a letter from Ms. Bostic providing a valid alibi for the him on the night of the crimes (Doc. No. 1 at 11), the petitioner has not provided this letter.[4] Thus, while the petitioner alleges that Ms. Bostic states in her letter "that she contacted Petitioner's counsels and told them that she would be willing to testify at trial and at the evidentiary hearing," (Doc. No. 1 at 11), there is no support for this contention. Under these circumstances, the petitioner cannot establish that trial counsel was ineffective in failing to interview and present Ms. Bostic as a witness.

Further, the petitioner does not provide any evidence regarding the substance of what Ms. Bostic's testimony would be. He does not explain what alibi Ms. Bostic would have provided or explain how this alibi would have proved beneficial in light of the evidence against him. The Sixth Circuit has instructed that, when "one is left with pure speculation on whether the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." *Baze v. Parker*, 371, F.3d 310, 322 (6th Cir.2004*), cert. denied*, 544 U.S. 931 (2005). The petitioner has not shown that the testimony of Ms. Bostic would have resulted in a reasonable probability that, had trial counsel subpoenaed the witness, the petitioner's trial would have turned out differently. *See Kelley v. United States*, No. 1:13-cv-70, 1:08-cr-51, 2014 WL

---

[4] The petitioner purports to have attached the letter as Exhibit 2 to an Appendix submitted along with his petition, but the letter is not attached. (Doc. No. 1 at 11 & Attach. 1). The only documents attached to the Appendix are a letter from the Board of Professional Responsibility to the petitioner dated May 23, 2017, and a handwritten copy of the petitioner's amended petition for post-conviction relief. (Doc. No. 1, Attach. At 1-5).

2921821, at *14 (E.D. Tenn. June 27, 2014) (holding that petitioner's unsupported claims of what counsel failed to do, without any evidence of what a more thorough investigation would have revealed, was insufficient to demonstrate by a preponderance of the evidence that counsel performed deficiently; moreover, even assuming that counsel performed deficiently, petitioner failed to establish a reasonable probability that, had counsel conducted a more extensive investigation, the outcome of Petitioner's case would have been different).

This claim is not substantial, and Petitioner has not shown that he was prejudiced by post-conviction counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default of this claim. The claim is without merit and will be dismissed.

### 3. Claim 6: Whether trial counsel provided ineffective assistance of counsel by failing to request an interpreter for the petitioner during trial

Finally, the petitioner alleges that trial counsel provided constitutionally deficient representation by failing to request an interpreter for the petitioner during his trial. (Doc. No. 1 at 12-13). According to the petitioner, without an interpreter, "[h]e could not effectively communicate with his counsel or understand the proceedings against him." (*Id*. at 13). He contends, therefore, that "[t]he denial of a court appointed interpreter was contrary to law [and] fundamental fairness at trial under the Due Process [Clause]." (*Id*.) He also alleges that "the state court's decision that counsel was not ineffective in this regard[] is contrary to or involved an unreasonable application of Supreme Court precedent prohibiting an unfair trial." *Id*.

The respondent contends that the petitioner did not raise a federal Due Process claim in the underlying state court proceedings; consequently, such a claim is procedurally defaulted. (Doc. No. 37 at 37). The respondent further contends that, to the extent the petitioner's claim regarding

the lack of an interpreter at trial is subsumed by his claim on post-conviction appeal, the state courts' rejection of this claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. (*Id.*)

"This circuit has held that the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (citing *Pillette v. Fotz*, 824 F.2d 494, 497 (6th Cir. 1987)). Here, the federal Due Process claim the petitioner raises in his instant habeas petition is a separate and distinct legal theory from the one he fully exhausted in state court. In his amended petition for post-conviction relief, the petitioner arguably raised a state due process claim in connection with trial counsel's failure to secure an interpreter for the petitioner. (Doc. No. 8, Attach. 16 at PageID# 1284). However, the petitioner abandoned this claim in his brief on appeal of the denial of post-conviction relief; he asserted only that "[t]he post-conviction court erred in finding that trial counsel's failure to secure an interpreter for the appellant during his trial was reasonable and did not render counsel ineffective." (Doc. No. 8, Attach. 19 at PageID# 1448). On appeal of the denial of post-conviction relief, the petitioner's entire argument was that the performance of trial counsel violated the petitioner's rights under the Sixth Amendment to the United States Constitution and Article 1, section 9 of the Tennessee Constitution. (*Id.* at PageID# 1447-1450). The petitioner's brief did not mention the petitioner's Due Process rights under either the state or federal Constitutions. (*Id.*) The Tennessee Court of Criminal Appeals did not consider a state or federal Due Process claim. *Kuot*, 2016 WL 73595687, at **4-6. Thus, under the governing Sixth Circuit precedent of *Wong*, the petitioner failed to exhaust this claim as a federal Due Process claim in the state court proceedings.

By failing to present a federal Due Process claim alleged in the instant petition to the state courts, the petitioner procedurally defaulted the claim. He, therefore, has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged errors. The petitioner relies on *Martinez* to excuse his default. (Doc. No. 1 at 13). However, *Martinez* does not apply because the petitioner's claim is not one of ineffective assistance of trial counsel. *Abdur'Rahman*, 805 F.3d 710, 714. Therefore, the petitioner cannot show cause and prejudice to excuse the default, and the petitioner's federal Due Process claim in connection with the lack of an interpreter must be dismissed as procedurally defaulted.

The petitioner argued in his amended petition for post-conviction relief that his attorney was ineffective in failing to secure him an interpreter under both the Tennessee and federal Constitutions. (Doc. No. 8, Attach. 16 at PageID# 1282-83). The post-conviction court denied relief. (Doc. No. 8, Attach. 16 at PageID# 1291-93). On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals began its analysis by setting forth the governing legal standard for claims of ineffective assistance of counsel. *Kuot,* 2016 WL 73595687, at **7-8. Applying *Strickland* and its progeny, the state appellate court concluded that the evidence in the record supported the post-conviction court's conclusion that trial counsel's performance was not deficient. *Id.* at *8.

Regarding trial counsel's performance, the Court of Criminal Appeals held that the post-conviction court did not err when it determined that trial counsel's performance was not deficient. As the state appellate court explained:

> Counsel testified that he met with the Petitioner numerous times over the course of his two years representing him. He said he had no difficulty communicating with the Petitioner. The two doctors who interviewed the Petitioner also did not have difficulty communicating with him. Counsel reviewed the Petitioner's interviews

> with police, during which the Petitioner answered their questions appropriately, provided them with an alibi, and did not express any lack of understanding. The Petitioner testified at his trial that he attended college in Michigan, supported by a bill to the school found by police in the Petitioner's vehicle. The Petitioner filled out his own petition for post-conviction relief. The post-conviction court credited Counsel's testimony and found the Petitioner's post-conviction testimony not credible, and we will not reweigh or reevaluate credibility determinations on appeal. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009). The Petitioner is not entitled to relief.

*Kuot*, 2016 WL 7395687, at *8. Regarding prejudice, the Tennessee Court of Criminal Appeals agreed with the post-conviction court that the petitioner had failed to show that counsel's performance caused him to suffer prejudice at trial. *Id.*

The state courts' findings, including its credibility assessments, were not unreasonable. The court "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." *Mitchell v. Mason*, 325 F.3d 732,737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes the state courts' credibility findings. *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2001). Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). A state court's credibility finding on a particular issue may be overturned by a habeas court only when "evidence on the issue[ ] raised ... is too powerful to conclude anything but" that the trial court's finding was unreasonable. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

The post conviction court credited counsel's testimony and found that petitioner's post-conviction testimony not credible. The petitioner has not identified any evidence to rebut this credibility determination.

With respect to trial counsel's performance, the record showed that trial counsel testified at the petitioner's post-conviction hearing that he "never had any problem" communicating with the petitioner. (Doc. No. 8, Attach. 17 at PageID# 1306). The record further showed that, based on his numerous conversations with the petitioner, trial counsel did not believe the petitioner needed an interpreter. (*Id*. at PageID# 1306, 1316-17, 1318-19). When interviewed by police, the petitioner never said that he needed an interpreter, and he understood English well enough to provide an alibi. (*Id*. at PageID# 1320). The two doctors who interviewed the petitioner never indicated to trial counsel that they believed the petitioner had difficulty understanding them. (*Id*. at PageID# 1320-21).

Even if the petitioner had established that trial counsel's preparation and investigation were constitutionally deficient, the state courts' conclusion that the petitioner had not demonstrated prejudice as a result of the failure of trial counsel to interview the detective was not an unreasonable application of clearly established federal law, nor was it based upon an unreasonable application of the facts in light of the evidence before the state court. This claim, like the others, is without merit and will be dismissed.

## V.    Conclusion

For the reasons set forth herein, the petition filed by Gai Kuot seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice. All of the petitioner's claims are either procedurally defaulted or fail on the merits.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of the petitioner's claims, the court will deny a COA.

An appropriate order will be entered.

Aleta A. Trauger
United States District Judge